## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 21-CV-336 |
| PLAINTIFF, | |
| V. | TST'S RESPONSE IN OBJECTION TO CITY'S MOTION TO DISMISS |
| CITY OF BELLE PLAINE, MN | |
| DEFENDANT. | |

## INTRODUCTION AND SUMMARY

COMES NOW TST, by and through counsel of record, with a response in objection to the City's motion to dismiss. The City's motion to dismiss should be denied in full. The recurring error in the City's brief is that it disregards the facts pleaded.

The City prefers to construe the complaint as if it did not articulate a clear basis for finding that the City engaged in viewpoint discrimination. When the Court accepts as true all facts pleaded in the complaint, drawing all reasonable inferences in favor of TST, it will find that the City violated several safeguards, under both the Federal and Minnesota Constitutions.

The City adopted the Enacting Resolution "basically, so the Cross can go back in the Park" while simultaneously securing assurances that it would exclude a Satanic monument. This invidious purpose was given effect. In all, the Christian monument was given 10 months of exclusive access to the Park but, once TST's monument was set to be installed, the City shut down the Park. This violates the Free Speech bar against viewpoint discrimination, the Free Exercise bar against substantially interfering with religious practices, and the Establishment

Clause and Equal Protection prohibitions against disparate treatment among religions.

Even if the Court finds no invidious discriminatory motive (under the Federal Constitution) or effects (under the Minnesota Constitution), the City also ran afoul of the Due Process clause. By granting TST the Permit, the City vested TST with a protectible property interest to install the Display in the Park until March 29, 2018. That Permit could not be rescinded without affording at least a meaningful notice and a meaningful hearing. The City afforded TST no notice, because it resolved to rescind the Permit in secret, and no hearing because TST did not get an invitation to that secret meeting. The Court should deny the City's motion in full.

<u>**ARGUMENT**</u>

**Legal standard**

On a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must take the well-pleaded allegations of the complaint as true, and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." <u>Morton v. Becker</u>, 793 F.2d 185, 187 (8th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

**1: Res judicata**

This complaint is not barred by res judicata because there is no preexisting final judgment on the merits. The Magistrate Order denying leave to amend the complaint is not a "final judgment on the merits" because (1) magistrates lack the power to enter involuntary orders of dismissal; and (2) denying leave to amend is not a "final judgment on the merits."

<u>1.1: Magistrates lack the power to enter involuntary orders of dismissal.</u>

The City neglects that magistrates lack the power to enter involuntary orders of dismissal. Magistrates are vested with limited authority. 28 USC § 636. Importantly, Congress withheld from Magistrates the authority to "dismiss for failure to state a claim upon which relief can be granted" and "to involuntarily dismiss an action." 28 USC § 636(b)(1)(A).

Magistrates lack the power to effectuate a final judgment because that would usurp the traditional adjudicatory function of an Article III judge. <u>United States v. Flaherty</u>, 668 F.2d 566, 585 (1st Cir. 1981) ("only an Article III court, not a magistrate, may constitutionally enter a final judgment; a magistrate is, therefore, authorized to make only those determinations that do not constitute final judgments"); see also <u>Harris v. Folk Const. Co.</u>, 138 F.3d 365, 371 (8th Cir. 1998) ("absent clear and unambiguous consent of the affected parties, a district judge may not delegate, pursuant to § 636(b)(3), duties that require a final and independent determination of fact or law by the magistrate judge.")

There being no "clear and unambiguous consent" by TST for the Magistrate to preside over <u>Belle Plaine I</u>, the Magistrate was under the "constant and direct supervision of an Article III judge [here, Judge Wright]." <u>Harris</u>, 138 F.3d at 371. Hence the objection to magistrate

order.  Belle Plaine I at doc. 91.  Thus, the Magistrate Order is not a "final judgment on the merits."

### 1.2: Denying leave to amend is not a "final judgment on the merits."

Denying leave to amend a complaint is not, by itself, a "final judgment on the merits." Where, as here, the first complaint was dismissed without prejudice, the Eighth Circuit has declined to "contort the district court's denial" of leave to amend "into a denial on the merits." Kulinski v. Medtronic Bio–Medicus, Inc., 112 F.3d 368, 373 (8th Cir.1997) (observing that a denial of leave to amend does not have a preclusive effect on an amended complaint where the adjudication of the first complaint is not on the merits).  The City's contrary claim is based on cases with inapposite procedural histories.

Orders of dismissal can be "on the merits" (i.e. with prejudice), or not.  See FRCP 41(b) ("*Unless the dismissal order states otherwise*, a dismissal under this subdivision (b) and any dismissal not under this rule--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits") (emphasis added).

When resolving res judicata, the difference is "significant."  9 Fed. Prac. & Proc. Civ. § 2373 (4th ed.).  A dismissal "with prejudice" is the predicate for res judicata.  Id.  But when a district court exercises its discretion to specify that a dismissal is "without prejudice," a second suit is not barred.  Id.; see also Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 505–06, 121 S. Ct. 1021, 1027, 149 L. Ed. 2d 32 (2001) ("The primary meaning of 'dismissal without prejudice,' we think, is dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim"); accord. DISMISSED WITHOUT PREJUDICE,

Black's Law Dictionary (11th ed. 2019) ("removed from the court's docket in such a way that the plaintiff may refile the same suit on the same claim.")

The order of dismissal for the constitutional claims was "**WITHOUT PREJUDICE**." Satanic Temple v. City of Belle Plaine, Minnesota, 475 F. Supp. 3d 950, 966 (D. Minn. 2020) (emphasis in original). By definition, that means the constitutional claims could be refiled. Knox v. Lichtenstein, 654 F.2d 19, 22 (8th Cir. 1981) (citing Costello v. United States, 365 U.S. 265, 286, 81 S.Ct. 534, 545, 5 L.Ed.2d 551 (1961)) ("If the first suit was dismissed for defect of the pleadings . . . the judgment rendered should not bar another suit.")

The City misdirects away from the operative dismissal by citing to the Magistrate's order which denied leave to amend. But the Magistrate's Order is a red herring because the order of dismissal "without prejudice" rendered the constitutional counts null. Gerhardson v. Gopher News Co., 698 F.3d 1052, 1056 (8th Cir. 2012) ("An involuntary dismissal without prejudice operates to leave the parties as if no action had been brought at all") (cleaned up).

Once the constitutional claims were dismissed without prejudice, the case was no longer pending before the Court and "the [C]ourt consequently lacked jurisdiction to take any further action in it, *including dismissing the case with prejudice*." Norman v. Arkansas Dep't of Educ., 79 F.3d 748, 751 (8th Cir. 1996) (emphasis added).

The City will point out that the above cannot be squared with the broad statements in the City's cited cases. This is because the City's statements of law are all non-binding dicta. As pointed out by the Kulinski Court, the City's precedent all involve the inapposite procedural history of a judgment on the merits *preceding* the denial of leave to amend. See:

- <u>Pro. Mgmt. Assocs., Inc. v. KPMG LLP</u>, 345 F.3d 1030, 1032 (8th Cir. 2003) ("After the district court denied leave to amend and entered a final judgment, but before PMA appealed, PMA filed another lawsuit (PMA II) against KPMG using the proposed amended complaint the district court had denied leave to file in PMA I");

- <u>Poe v. John Deere Co.</u>, 695 F.2d 1103, 1105 (8th Cir. 1982) (second suit barred where there was a preexisting summary judgment on the same factual predicate);

- <u>King v. Hoover Grp., Inc.</u>, 958 F.2d 219 (8th Cir. 1992) (same); see also <u>Long v. TRW Vehicle Safety Sys., Inc.</u>, No. CV-09-2209-PHX-DGC, 2010 WL 729465, at *5 (D. Ariz. Feb. 26, 2010) (recognizing that the City's quoted language from <u>King</u> is dictum);

- <u>Landscape Properties, Inc. v. Whisenhunt</u>, 127 F.3d 678 (8th Cir. 1997) (second suit barred because of a preexisting jury verdict on the same factual predicate).

Remove the predicate judgment on the merits and the denial of leave to amend becomes irrelevant. <u>Kulinski</u>, 112 F.3d at 373 ("We decline to contort the district court's denial of Kulinski's proposed amended complaint into a denial on the merits"); see also <u>McCarney v. Ford Motor Co.</u>, 657 F.2d 230, 234 (8th Cir. 1981) ("our earlier discussion demonstrates that McCarney I was not on the merits and, therefore, the doctrine preventing splitting a cause of action is not applicable.")

The Second Circuit has squarely confronted <u>King</u>. See <u>Curtis v. Citibank</u>, N.A., 226 F.3d 133, 139–40 (2d Cir. 2000). <u>King</u> stands for the proposition that a plaintiff must bring suit against the same defendant on all claims that relate to the same conduct, transaction, or event at the same time. <u>Id.</u> But "when the plaintiff's motion to amend is denied and the plaintiff

subsequently brings the amendments as a separate lawsuit," as here, "it is not the actual decision to deny leave to amend that forms the basis of the bar." Id. (quoting N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 88 (2d Cir. 2000)). "In fact, the actual decision denying leave to amend is irrelevant to the claim preclusion analysis." Id.

The Nebraska Supreme Court has also reviewed this issue. Millennium Lab'ys, Inc. v. Ward, 289 Neb. 718, 728, 857 N.W.2d 304, 306 (2014). The Ward Court found that "In each case where the Eighth Circuit held that the denial of leave to amend was a judgment on the merits, the denial either was directly tied to the merits of the proposed amended pleading or reflected that the proposed amendments were futile because there was a prior judgment on the merits in the case." Id. The Ward Court's independent research found no Eighth Circuit cases which concluded that "the denial of leave to amend was a judgment on the merits where leave to amend was denied for reasons apart from the merits, such as timeliness." Id.

Here, the underlying order of dismissal was explicitly "without prejudice." As a result, under Gerhardson, the constitutional claims were rendered a nullity. Thereafter, under Norman, the Court lacked the jurisdiction to dismiss the claims "with prejudice." Under Semtak, Knox, Curtis, and Ward, TST was clearly entitled to refile them. The City's authority to the contrary is rooted in a meaningfully different line of cases, which barred the second suit because of a predicate dismissal "with prejudice," as recognized by Kulinski, Ward, and Curtis. This case is controlled by Kulinski. As there, the Court should not "contort" the Magistrate Order's denial of leave to amend "into a denial on the merits." Kulinski, 112 F.3d at 373.

**2: Free speech**

The Free Speech Clause prohibits the City from enacting an "unreasonable" restriction of speech. See U.S. Const. amend I ("Congress shall make no law ... abridging the freedom of speech.") To resolve whether a speech restriction is "unreasonable," the threshold inquiry is whether it is content-based or content-neutral. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 763, 114 S. Ct. 2516, 2523, 129 L. Ed. 2d 593 (1994) ("Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech without reference to the content of the regulated speech. . . . We thus look to the government's purpose as the threshold consideration.") (internal quotes and citations omitted).

2.1: The Recission Resolution is the product of viewpoint discrimination.

The Recission Resolution is unconstitutional because it was enacted for the purpose of excluding TST's Display. Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 46, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794 (1983); Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 812, 105 S. Ct. 3439, 3454 (1985) ("justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"); and R. A. V. v. St. Paul, 505 U.S. 377, 386, 112 S. Ct. 2538, 2545 (1992) ("The government may not regulate use based on hostility -- or favoritism -- towards the underlying message expressed.")

As the Supreme Court recently explained, a speech restriction is content-based if it is "concerned with undesirable effects that that arise from the direct impact of speech on its audience or listeners' reactions to speech." McCullen v. Coakley, 573 U.S. 464, 481, 134 S. Ct. 2518, 2531-32 (2014). Viewpoint discrimination occurs when a law disfavors "ideas that

offend," which violates the First Amendment.  See <u>Iancu v. Brunetti</u>, 139 S. Ct. 2294, 2301, 204 L. Ed. 2d 714 (2019).

Here, TST has adequately pleaded that the City enacted the Recission Resolution because the City wanted to preclude the undesirable effects the Display would cause on its listeners. There was a public objection to TST's equal participation in the Park.  Doc. 1 at ¶¶ 160-184; Exhibit 14.  That public objection took the form of protests at the Park and a flood of objections to TST's Display.  Doc. 1 at ¶¶ 161-162; see also ¶ 200.

The Mayor took special note of the public objections, instructing the City Administrator to document the "numbers."  Doc. 1 at ¶ 165; Exhibit 15.  Upon learning that TST's Display was ready to be installed, the Mayor called for an off-the-record meeting to "discuss the whole public forum issue" and ultimately resolved to exclude TST's Display.  Doc. 1 at ¶¶ 191-192.

After this meeting, but before the Recission Resolution was enacted, the City Administrator began coordinating with the City's insurer about the contents of the Recission Resolution and the press release announcing the enactment of the Recission Resolution.  Doc. 1 at ¶¶ 193-195; Exhibit 18; see also Exhibit 27 (the press release).  She also provided this information to the City Attorney "to help us stay consistent."  Doc. 1 at ¶ 196; Exhibit 21.

The Recission Resolution, itself, is further evidence that the City excluded the Display because of its expected effects on an angry public.  The Recission Resolution recites that "the City Council has determined that allowing privately-owned memorials . . . no longer meets the intent or purpose of the Park."  Exhibit 25.

That was a half-truth.  The original intent of the Enacting Resolution was that private

memorials, exclusively from a Christian viewpoint, would be "in keeping with the Park's purpose;" and introducing a competing Satanic viewpoint would not. See Doc. 1 at ¶ 61 (Councilor Stier's comment at the Adopting Meeting: "[H]ow can we up here, be assured that, number one, these [Satanic] monuments won't go into that Park?") and id. at ¶ 171 (Mayor Meyer's explained at the Objection Meeting that the City adopted the Enacting Resolution "basically, so that the Cross could go back in the Park"); see also, generally, Exhibit 1 (the original resolution), Exhibit 10 (Councilor Stier's pretextual objection to TST's equal participation), Exhibit 14 (public objections to TST's Display because it is Satanic), Exhibit 15 (Mayor Meyer's poignant interest in the religious objections against TST's equal participation), and Exhibit 7 (the City resolved to modify the original plan so it would conform to this unconstitutional purpose at ¶ 1).

The Recission Resolution also proffers that:

> the City Council has also determined that the continuation of the limited public forum may encourage vandalism in the Park, reduce the safety, serenity, and decorum of the Park, unnecessarily burden City staff and law enforcement, and negatively impact the public's health, safety and welfare.

Exhibit 25. That was a mischaracterization. The City did not find that allowing the installation of private displays in the Park would cause these issues, the City found that protestors against TST's Display would cause them.

The Recission Resolution also states that there was a "full discussion thereof." Id. This is plainly false. The "full discussion" consisted exclusively of reading the title of the resolution and enacting it—without an opportunity for public discussion–alongside non-substantive

policymaking decisions as "Authorizing the Close of Fund 534 and Transfer Remaining Balance" and "Accept Cash Donation from Friends of the Library for Library Improvements." See generally Doc. 3 (Recission Meeting) at 0:01 - 3:44.

The City's position to the contrary relies on ignoring black-letter law. See Doc. 12 at pp. 20-22. The City first misdirects away from the City's liability by pointing to the City Councilor's legislative immunity. Satanic Temple v. City of Belle Plaine, Minnesota, 475 F. Supp. 3d 950, 958 (D. Minn. 2020). The Court's opinion was quite clear that this section only applies to legislative immunity. Id. ( "TST's Section 1983 Claims (Counts I, II, and III) *Against the Individual Defendants*") (emphasis added).

The City's contrary argument asks the Court to overturn Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035–36, 56 L. Ed. 2d 611 (1978) ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.")

Similarly, the City quotes dicta which relies on a concurrence, stating "we are governed by laws, not the intentions of legislators." Doc. 12 at p. 21 (quoting Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va., 722 F.3d 224, 231 (4th Cir. 2013), in turn quoting Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in judgment)). There are two problems with this.

First, the City is inarticulately making an incorrect point of law. The City is suggesting that

viewpoint discrimination is sometimes constitutional. See Doc. 12 at p. 21 (relying on <u>Hill v. Colorado</u>, 530 U.S. 703, 724 (2000)). <u>Hill</u> undermines the City's claim. See <u>Hill</u>, 530 U.S. at 716 ("it may not be the content of the speech, as much as the deliberate verbal or visual assault, that justifies proscription.") (cleaned up). <u>Hill</u> explains that we tolerate protected speech, even *offensive* protective speech, "because offended viewers can effectively avoid further bombardment of their sensibilities simply by averting their eyes." <u>Id.</u> (cleaned up).

The <u>Hill</u> Court did not uphold the speech restriction *in spite of* it being viewpoint discrimination, as the City claims. Doc. 12 at p. 21; contra. <u>Hill</u>, 530 U.S. at 719-725. Quite the opposite: the <u>Hill</u> Court found that the speech restriction was *not* viewpoint discrimination. <u>Id.</u> There, because "the statute applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries." <u>Id.</u> at 723.

Here, it is meaningfully different: the City arranged for the removal of the Christian Monument *before* excluding "all" monuments from the Park. Doc. 1 at ¶¶ 200 and 205 et seq. Unlike <u>Hill</u>, the Recission Resolution does *not* apply equally to all: it uniquely applied to TST.

Thus, the point that the City is failing to account for is: why the City passed the resolution not only matters, it can control the analysis. See <u>id.</u>, 530 U.S. at 723 (recognizing that "regulation of the subject matter of messages, though not as obnoxious as viewpoint-based discrimination, is also an objectionable form of content-based regulation.") and <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 105 L. Ed. 2d 661 (1989) ("The government's purpose is the controlling consideration.")

<u>2.2: The Recission Resolution is unreasonable</u>

Even if the Court finds that the speech restriction was content-neutral, that does not end the Free Speech inquiry because the Complaint also asserted that the Recission Resolution is an "unreasonable" speech restriction. Doc. 1 at ¶¶ 236-239 (quote is from ¶ 239). The City's solution was simply to ignore the text of the Complaint. See Doc. 12 at p. 22 (falsely claiming that "In the new complaint, the Temple again does not allege that the Rescinding Resolution itself was unreasonable and not viewpoint neutral").

As this Court originally explained, the constitutionality of speech restrictions depend on the character of the forum. See <u>Satanic Temple v. City of Belle Plaine, Minnesota</u>, 475 F. Supp. 3d 950, 961 (D. Minn. 2020).

The issue is whether the Recission Resolution is a reasonable time, place, and manner restriction which leaves open "ample" alternative channels of communication. <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 46, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794 (1983). The threshold is whether the time, place, and manner restrictions are "narrowly tailored to serve a significant governmental interest." <u>Bowman v. White</u>, 444 F.3d 967, 980 (8th Cir. 2006); see also <u>Krantz v. City of Fort Smith</u>, 160 F.3d 1214, 1221-22 (8th Cir. 1998) (requiring defendants to establish "a factual basis for concluding that a cause-and-effect relationship actually exists" between the proffered interest and the regulation).

The City bears the burden to justify the restriction. <u>Krantz</u>, 160 F.3d at 1218 ("Plaintiffs argue that defendants have failed as a matter of law to satisfy *their* burden of showing that the ordinances are narrowly tailored to serve a significant governmental interest and that they leave

open ample alternative channels for communication of the same information");

The City offers no governmental interest, no explanation for how it is a "significant" governmental interest, or how the Recission Resolution leaves open "ample" alternative channels for communication of the same information. See Doc. 12 at pp. 20-22. Thus, even if the Court finds that Recission Resolution is content-neutral, there is still no basis to dismiss the Free Speech count because the City failed to challenge the part of the Complaint that challenges the overbreadth of the Recission Resolution.

## 3: Free exercise

### 3.1: Federal Free Exercise Clause

The Free Exercise Clause prohibits the City from enacting a law which discriminates against some or all religious beliefs. U.S. Const. amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]"). A Free Exercise Clause case is resolved in two parts: (1) was a religious act burdened; and (2) was the religious act targeted? See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993).

The Complaint asserts a Federal Free Exercise Clause claim because of the allegations that (1) TST's efforts to install the Display in the Park was a religious act; (2) the City enacted the Rescinding Resolution to preclude TST from installing the Display in the Park; and (3) as a result, TST was unable to engage in the religious act of installing the Display in the Park.

#### 3.1.1: Religiosity

The first Free Exercise question is whether the City burdened a religious act. It did. The

Complaint asserts in significant factual detail that TST's efforts to install the Display in the Park was an expression of its core religious beliefs.  Doc. 1 at ¶ 243; see also ¶¶ 111-148.  The City vested TST with a clear right to engage in this religious conduct by issuing the Permit.  Doc. 1 at ¶ 149; Exhibit 12.  By closing the Park to the Display, TST was unable to engage in the religious conduct contemplated by the permit.  Doc. 1 at ¶¶ 220-223; see also Exhibit 26.

The City challenges the sufficiency of whether "installing displays in public places" was the "manifestation of some central tenet of" TST's doctrine.  Doc. 12 at pp. 24-25.  There are two problems with this.  First, centrality is not the question.  The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions."  Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S.Ct. 2012, 2022 (2017)(internal quotes omitted).

The City's argument thus disregards that the legal standard requires treating all allegations of the complaint as true.  So, the easy response to the City's argument is "installing displays in public places" is the "manifestation of some central tenet of a person's religious beliefs" because the complaint says so.  Doc. 1 at ¶ 243 ("For TST, installing the Display was an expression of its core religious beliefs"); as to why, see id. at ¶¶ 111 et seq.

Second, and far more grievously, the City appears to invite the Court to open a fact inquiry into whether "installing displays in public places" is the "manifestation of some central tenet of a person's religious beliefs."  The Religion Clauses prohibit that very inquiry.  E.g. Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 887, 110 S. Ct. 1595, 1604, 108 L. Ed. 2d 876 (1990) ("Repeatedly and in many different contexts, we have warned that courts

must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim").

Without getting into unnecessary briefing on the doctrine of abstention from ecclesiastical affairs, the short answer is "installing displays in public places" is the "manifestation of some central tenet of a person's religious beliefs" because that is a pure question of TST's doctrine and TST's answer is "it is." See generally 77 C.J.S. Religious Societies § 121; Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2060, 207 L. Ed. 2d 870 (2020) ("Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith *and doctrine* without government intrusion.") (internal quotation marks omitted) (emphasis added); Drevlow v. Lutheran Church, Missouri Synod, 991 F.2d 468, 471 (8th Cir. 1993) ("The Constitution forbids secular courts from deciding whether religious doctrine or ecclesiastical law supports a particular decision made by church authorities.")

This also forecloses the City's argument that "There are no longer any private displays for the Temple to 'compete' against." Doc. 12 at p. 25. The City raises an "inconsistent application of belief" argument which invites the Court to ignore that the Supreme Court has cautioned that courts "should not undertake to dissect religious belief." Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981); see also United States v. Ali, 682 F.3d 705, 710–11 (8th Cir. 2012) ("the court erred by evaluating the orthodoxy and sophistication of Ali's belief, instead of simply evaluating whether her practice was rooted in her sincerely held religious beliefs"). Even then, the City is wrong. TST's

Display competes against the combined 10-month period that the City allowed the Christian Monument to have exclusive access to the public sphere.

In sum, TST's efforts to install the Display in the Park was a religious act because the complaint says so and because TST says so. The City's arguments run afoul of the legal standard and of the constitutional prohibition of a secular court second-guessing religious doctrine.

### 3.1.2: Neutrality

The second Free Exercise Clause question is whether the City prevented that religious act pursuant to a neutral rule. The City argues that the Federal Free Exercise Clause claim is non-actionable because the Rescinding Resolution is *facially* neutral. Doc. 12 at p. 25. The problem with the City's argument is that "Facial neutrality is not determinative." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534 (1993). A facially neutral law "may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." Wisconsin v. Yoder, 406 U.S. 205, 220 (1972).

It is no defense for the City that the Rescinding Resolution is merely a "subtle" or "covert" departure from neutrality. The Free Exercise Clause "forbids subtle departures from neutrality," Gillette v. United States, 401 U.S. 437, 452 (1971). It also forbids "covert suppression of particular religious beliefs," Bowen v. Roy, 476 U.S. 693, 703 (1986). That is because the Free Exercise Clause was written to "protect religious observers against unequal treatment." Hobbie v. Unemployment Appeals Com'n of Fla., 480 U.S. 136, 148 (1987).

When a government has raised an "arguably religious policy"–as here–the Court's duty is to determine a "sham" secular purpose from a sincere one. <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 308, 120 S. Ct. 2266, 2278 (2000). The inquiry is to determine *why* the City passed the law: if it was to burden a religious practice, the law must survive strict scrutiny. <u>Church of the Lukumi Babalu Aye</u>, 508 U.S. at 546; see also <u>Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n</u>, 138 S. Ct. 1719, 1721–22, 201 L. Ed. 2d 35 (2018) ("The government, consistent with the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.")

To fuel that determination, the Court looks at all relevant evidence of the Council's object, both direct and circumstantial. <u>Id.</u> at 540. This is an objective test. <u>Id.</u> ("These objective factors bear on the question of discriminatory object.") Relevant includes, among other things,

1. the historical background of the decision under challenge (<u>id.</u>);

2. the specific series of events leading to the enactment or official policy in question, (<u>id.</u>);

3. the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body (<u>id.</u>); and

4. How the law operated in its real-world application (<u>id.</u> at 533-35).

Here, TST was sufficiently alleged facts that lead to a finding of discriminatory object. The City adopted the Veterans Group's proposal "basically so the Cross could go back in the Park."

Exhibit 28 (June 5, 2017 Objection Meeting); Doc. 1 at ¶ 171. The Veterans Group's proposal came from a standpoint that the Cross–and only the Cross–would be allowed in and the proposal was designed particularly to exclude a Satanic monument. Exhibit 1.

The City did so with the subjective understanding that TST would want to place a competing monument. Doc. 1 at ¶¶ 39-40. Councilor Stier, who was a tie-breaking vote, explained that he wanted the Cross but not a competing monument from an Atheist or Satanic viewpoint. Exhibit 28 (February 6, 2017 Adoption meeting); Doc. 1 at ¶¶ 57, 61, 211, 257, 276).

Councilor Stier later objected to TST's application because on the pretextual basis of TST not being a City resident. Exhibit 10. In reality, he objected because of his religious objection, not because of the absent requirement. Exhibit 28 (February 6, 2017 Adoption meeting); Doc. 1 at ¶ 109.

The Mayor objected based on TST's viewpoint, as well. Exhibit 15; Doc. 1 at ¶ 87. The Mayor was keenly interested in the public objection to TST's equal participation based on TST's religious viewpoint. Exhibit 15. The Mayor had adopted the Veterans Group's preference for Christianity over all other religions. Doc. 1 at ¶ 87. And the Mayor gave unique access to City personnel to the Veterans Group over TST. Doc. 1 at ¶ 78.

The timing of the Recission Resolution is suspect, as well. It was only moments after learning that TST's Display was ready for installation that the City began taking steps to exclude TST's Display from the Park. Exhibits 17-18. The City held an off-the-record meeting with the Veterans Group to resolve how to go about excluding TST's Display.

Exhibit 2. Immediately after that meeting, the City began coordinating its press release with its insurer about what would become the Recission Resolution. Exhibit 18. And, in a pretextual effort to appear neutral, the City had the Christian Monument removed. Exhibit 20. All the while, the City had been falsely suggesting to TST that the installation was proceeding as normal. Exhibit 22.

The manner in which the Recission Resolution was enacted is suspect, as well. The two public meetings that involved the Park had been largely devoted to the controversy of whether to open the Park and whether to allow TST equal access. Exhibit 28 (February 6, 2017 Adoption Meeting and February 21, 2017 Enacting Meeting). Yet, the public meeting that entailed closing the Park devoted a scant eight seconds—consisting entirely of reading the title of the Recission Resolution—with no opportunity for public commentary. Doc. 1 at ¶¶ 208-209; Exhibit 28 (July 17, 2017 Recission Meeting). The City resolved to enact the Rescinding Resolution ahead of time, while safely off-the-record. Doc. 1 at ¶ 192.

Taking all the above as true, and giving the TST the benefit of all reasonable inferences, it cannot be seriously argued that the City enacted the Recission Resolution for the contemplated purpose of prohibiting TST from emplacing the Display in the Park. That is not neutral. The Recission Resolution must survive strict scrutiny, and yet the City has not announced any interest it was attempting to protect by enacting the Recission Resolution. Thus, the City's motion should be denied.

Taking all the above as true, and giving the TST the benefit of all reasonable inferences, it cannot be seriously argued that the City enacted the Recission Resolution for the contemplated

purpose of prohibiting TST from emplacing the Display in the Park. That is not neutral. The Recission Resolution must survive strict scrutiny, and yet the City has not announced any interest it was attempting to protect by enacting the Recission Resolution. Thus, the City's motion should be denied. Somewhat relatedly on this topic the City argues that there is no constitutional right to erect a private structure on public property. Doc. 12 at p. 24. The issue is whether the City can engage in viewpoint discrimination, not whether TST has a constitutional right to erect a private structure on public property. Contra. <u>Knights of Columbus, Council No. 94 v. Town of Lexington</u>, 272 F.3d 25, 32 (1st Cir. 2001) (applying <u>Church of Lukumi Babalu Aye</u> principles, but finding that the regulation was "a far cry from an invidious singling-out of the creche"); see also <u>Am. Jewish Cong. v. City of Beverly Hills</u>, 90 F.3d 379, 384 (9th Cir. 1996) ("The City may not have a general policy banning unattended private displays, but, on an ad hoc basis with no standards to guide it, choose one religious group and permit it to erect a display while denying all other groups permission to erect displays.")

So the City's point would be well-taken but for the fact that the City enacted the Enacting Resolution to accommodate the erection of private religious structures on public property. Because the City opened the Park to the Cross, it also opened the Park to the Display. And because installing the Display was a religious act, the City could not close the Park to the Display without offending the Free Exercise Clause.

### 3.2: The Minnesota Free Exercise Clause

The Minnesota Free Exercise Clause removes neutrality as a defense. See Minn. Const.

art. 1 § 16; <u>State v. Hershberger</u>, 462 N.W.2d 393, 397 (Minn. 1990). Under Minnesota's Free Exercise Clause, the test is whether: (1) the objector's belief is sincerely held; (2) the state action burdens the exercise of religious beliefs; (3) the state's interest is overriding or compelling; and (4) the state action uses the least restrictive means. <u>Odenthal v. Minnesota Conference of Seventh-Day Adventists</u>, 649 N.W.2d 426, 442 (Minn. 2002).

On the first and second elements, Minnesota prohibits judicial second-guessing of religiosity. <u>Odenthal</u>, 649 N.W.2d, at 442 ("it is not the province of the court to examine the reasons for a religious belief.") <u>State v. Pedersen</u>, 679 N.W.2d 368, 374 (Minn. App. 2004) ("if there is any doubt about whether a particular set of beliefs constitutes a religion, the court will err on the side of freedom and find that the beliefs are a religion").

The threshold inquiry is "whether compliance requires a change in religious conduct or philosophy." <u>Edina Community Lutheran Church v. State</u>, 745 N.W.2d 194, 204 (Minn. App. 2008) (internal quotes omitted). "To constitute such a burden, the challengers must establish that the risk of interference with religious beliefs or practice is real and not remote." <u>Newstrand v. Arend</u>, 869 N.W.2d 681, 687 (Minn. App. 2015). "[O]nce a claimant has demonstrated a sincere religious belief intended to be protected by section 16, the state should be required to demonstrate that public safety cannot be achieved by proposed alternative means." <u>State v. Pedersen</u>, 679 N.W.2d 368, 373 (Minn. Ct. App. 2004).

Emplacing the Display in the Park was the expression of a sincerely held religious belief. Doc. 1 at ¶ 243; see also ¶¶ 111-148. The City vested TST with a clear right to engage in this religious conduct by issuing the permit. Doc. 1 at ¶ 149; Exhibit 12. By closing the Park to

the Display, TST was unable to engage in the religious conduct contemplated by the permit. Doc. 1 at ¶¶ 220-223; see also Exhibit 26. Thus, the Recission Resolution precluded TST from engaging in its religious conduct.

Because TST has established its sincerely held religious beliefs were infringed by the City's action, "the burden now shifts to the state to demonstrate the existence of compelling and overriding governmental interests that may, under some circumstances, outweigh the important interest in preserving religious liberty." Edina Community Lutheran Church, 745 N.W.2d 194, 208 (Minn. App. 2008). The City has proffered neither facts nor argument that would indicate a compelling and overriding interest to support its decision to rescind TST's permit. Doc. 12 at pp. 23-27.

Nothing in the language of the Rescinding Resolution provides a "compelling" justification for the closure, other than pretextual concerns that the Park would "encourage vandalism in the Park, reduce the safety, serenity, and decorum of the Park." Doc. 1 at ¶¶ 213-215. Instead, the internal communication of the City's employees show a concerted effort to yield to heckler's veto and discourage the propagation of Satanism, while simultaneously stringing along TST until the City had executed on its scheme to appear neutral. Simply put, the City cannot meet its burden to demonstrate a compelling and overriding interest that outweighs TST's sincerely held religious beliefs when it decided to rescind the Permit for the Display.

Even if the City had demonstrated an adequate interest, there are neither facts nor argument to suggest that public safety could not have been achieved through a reasonable alternative means. "To infringe upon religious freedoms which this state has traditionally

revered, the state must demonstrate that public safety cannot be achieved through reasonable alternative means." Hershberger, 462 N.W.2d, at 399. The City's pretextual concern with vandalism and keeping the peace has an obvious solution: punish the vandals, and provide adequate law enforcement to protect the peace in the forum that the City opted to create.

In sum, placing the Display in the Park was an exercise of TST's sincerely held religious beliefs. The City interfered with that religious activity by closing the Park to the Display. Under the Minnesota Constitution, it is unnecessary to further find that the City closed the Park for the purpose of excluding the Display. The City offers neither a justifiable interest nor an explanation how the justifiable interest cannot be achieved through reasonably alternative means. Thus, TST has stated a claim under the Minnesota Free Exercise Clause.

## 4: Establishment Clause

### 4.1: Federal Establishment Clause

#### 4.1.1: Standing

In a footnote, the City questions standing. Doc. 12 at p. 29. Standing is straightforward in a religious display case. See Red River Freethinkers v. City of Fargo, 679 F.3d 1015, 1023-24 (8th Cir. 2012). Under Eighth Circuit law, the question is if TST has a member who has personally interacted with the allegedly religious display and was offended by it. Id. "Personally interacted" means "saw the monument in person" as contrasted with "read about it in the newspaper" Id. at 1024.

TST has such a member: Doe. See Doc. 1 at ¶¶ 26-34. The Doe member personally interacted with the monument because she saw it twice-daily (¶ 32) and was offended by it

because it made her feel like a second-class citizen in her own town (¶ 33).

Causation is established by the fact that the City enacted the Enacting Resolution for the purpose of accommodating, uniquely, the Christian monument with the purpose of providing preferential treatment for Christianity. Doc. 1 at ¶¶ 44-100 (more details on the merits, below).

Redressibility is established by the prayed-for orders: (1) a declaration that the City violated the Establishment Clause by enacting the Enacting Resolution and Rescinding Resolution, as written (¶ 263, see also prayer for relief at ¶ 6); (2) ordering injunctive relief that the Rescinding Resolution is declared unconstitutional (prayer for relief at ¶¶ 1-2); and (3) further declaring unconstitutional the parts of the Enacting Resolution which makes it prefer Christianity (prayer for relief at ¶ 3).

### 4.1.2: Merits

The City argues that the Establishment Clause claims fail because the City did not coerce TST or its membership to engage in a religious observance. Doc. 12 at p. 28. Coercion is a red herring, the issue is preference.

The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. <u>Larson v. Valente</u>, 456 U.S. 228, 244-46, 102 S. Ct. 1673, 1683-84 (1982). When it is claimed that a religious preference exists, in violation of the Establishment Clause, "the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971)."

Hernandez v. C.I.R., 490 U.S. 680 (1989).

For a facially neutral law to survive the <u>Lemon</u> test, the act must have (1) a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the act must not foster an excessive government entanglement with religion. <u>Lemon</u>, 403 U.S., at 612–13.

"<u>Lemon</u>'s 'purpose' requirement aims at preventing [government] from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" <u>McCreary County, Ky. v. American Civil Liberties Union of Ky.</u>, 545 U.S. 844, 860 (2005). By showing a purpose to favor religion, the government "sends the message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.' " <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 309–10, 120 S. Ct. 2266, 2279, 147 L. Ed. 2d 295 (2000). The purpose of a law may be interpreted based "upon recorded proceedings made before and during the consideration and passage of the act." <u>Laue v. Production Credit Ass'n of Blooming Prairie</u>, 390 N.W.2d 823, 828 (Minn. App. 1986).

Here, the purpose of the Enacting Resolution was to simultaneously: (1) permit the Veterans Group to place a Cross within the Park; and (2) exclude an Atheistic or Satanic organization from expressing a competing view.

We know this because Councilor Stier–who supplied a tie-breaking vote–only voted for the Enacting Resolution after seeking assurances that no Atheistic or Satanic competing monuments would be allowed in the Park. Doc. 1 at ¶¶ 56-57 (Atheistic); 61 (Satanic). The

Mayor publicly proclaimed that Enacting Resolution was passed "basically, so the Cross could stay in the Park." Doc. 1 at ¶ 171. The public objection to, specifically, a Satanic monument was something the Mayor paid close attention to. Doc. 1 at ¶ 165; see also generally ¶¶ 167-182. The Mayor requested that Father Lynch share his objection to the Veterans Group to "help the entire process," i.e. the process of excluding TST's Display from the Park. Id. at ¶¶ 183-184.

Further, the very the text of the Enacting Resolution betrays its unconstitutional purpose. The Veterans Group and the ADF drafted their Proposal for the contemplated purpose of accommodating the Christian monument while excluding an Atheistic and a Satanic monument. Doc. 1 at ¶¶ 35-40; 62. The City adopted this unconstitutional purpose by failing to exclude all of the parts that betrayed the purpose:

1. The Enacting Resolution retains the size-limitation that no other display may exceed the size of the Christian monument. Doc. 1 at ¶ 99(1);

2. The Enacting Resolution retains the materials limitation that all displays must be made of the same materials as the Christian monument. Doc. 1 at ¶ 99(2);

3. All displays must be removed within one year of approval, which was designed to minimize the City's exposure to an "undesirable" monument. Doc. 1 at ¶ 99(3); and

4. All displays must be the subject of a $1,000,000 insurance policy, which was designed to minimize the City's exposure to an "undesirable" monument and which was no hurdle for the Veterans Group. Doc. 1 at ¶ 99(4).

The Enacting Resolution fails <u>Lemon</u>'s purpose requirement because the proponents and the decisionmakers which passed the Enacting Resolution all intended to promote a Christian viewpoint while excluding an Atheistic or Satanic viewpoint.

The Enacting Resolution and Recission Resolution also fail the effects test. As pointed out by the <u>Church of Lukumi Babalu Aye</u> Court, "the effect of a law in its real operation is strong evidence of its object." <u>Id.</u>, 508 U.S. at 535.

The effect of the Enacting Resolution was to permit a Christian monument, and only a Christian Monument. The City shut down the Park to all displays when it became apparent that a Satanic monument would be competing with the Christian monument. Doc. 1 at ¶¶ 187-204; see also ¶ 212. So long as the Park allowed for the installation of a Christian monument, only a Christian monument, the Enacting Resolution was "in keeping with the Park's purpose" as modified by the Enacting Resolution. Exhibit 25. But when TST's Display was going to be installed, preferential treatment for Christianity would be no more. See Doc. 1 at ¶ 159 (only the Christian monument and TST's display were granted permits). TST's Display disrupted the unconstitutional purpose the Enacting Resolution (i.e. Christian exclusivity in the Park), hence the Recission Resolution.

As for excessive entanglement, the inquiry is necessarily one of degree. <u>Walz v. Tax Comm'n of City of New York</u>, 397 U.S. 664, 674, 90 S. Ct. 1409, 1414, 25 L. Ed. 2d 697 (1970). But the point requires no extensive briefing. It is "excessive entanglement" when a government takes sides in a religious debate in such a manner that results in fractionalizing the electorate along religious lines. 16A C.J.S. Constitutional Law § 864; see also <u>Lemon</u>, 403 U.S.

at 622 ("political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.")

Here, the City made a political question out of religious affiliation. Its "favored" class of the electorate were Christians. Its "disfavored" class was Atheists and Satanists. This resulted in a public controversy surrounding the role of a city government in accommodating religious debates in its park. The Establishment Clause was adopted to exclude this very controversy.

4.2: Minnesota Establishment Clause

The City also challenges TST's count for a violation of Minnesota's Establishment Clause. Doc. 12 at pp. 29-31. Minnesota's Establishment Clause analog is at art. 1 §16 and explicitly prohibits a government from giving "*any* preference by law to any religious establishment or mode of worship." Id. (emphasis added).

Under the Federal Establishment Clause, the issue is whether the Enacting Resolution had such a predominant purpose of preferring Christianity that it amounts to the establishment of a state-sanctioned religion. McCreary, 545 U.S. at 860; cf. Van Order v. Perry, 545 U.S. 677 (2005). But under the Minnesota Constitution, the question is if the Enacting Resolution had *any* effect of preferring Christianity. The state claim is concerned with the effect, not the proof of motive.

As with the analysis under federal law, Minnesota courts apply the Lemon test to determine whether a government action violates Minnesota's Establishment Clause. Edina Community Lutheran Church v. State, 745 N.W.2d 194, 211 (Minn. App. 2008). But permissibility under the Federal Establishment Clause does not connote permissibility under Minnesota's analog.

Id. ("government action that is permissible under the federal constitution . . . may nonetheless violate the Minnesota Constitution.")

Under the Minnesota Constitution, the focus is on the effect ("any preference") rather than the motive. This does not suggest that the proof of motive is irrelevant; it is simply unnecessary for TST to win a judgment under the Minnesota Constitution.

While all of the same Lemon analysis applies here, the only facts that matter are that (1) the Enacting Resolution granted a Christian monument exclusive access to the public sphere; until (2) once it became clear that this would no longer be the case, the Recission Resolution was passed just in time to preclude a competing monument from a different viewpoint.

## 5: Equal protection

### 5.1: Federal Equal Protection

The City also challenges the equal-protection claims, arguing that the Enacting Resolution and Rescinding Resolution "treated the Temple the same as any other individual or organization." Doc. 12 at p. 31. This is factually false, so the City's motion must be denied.

"To state an equal-protection claim, a plaintiff must allege that a law either is discriminatory on its face or has both a discriminatory purpose and discriminatory impact." Mitchell on Behalf of X.M. v. Dakota County Social Services, 357 F.Supp.3d 891, 902 (D. Minn. 2019). "The plaintiff must allege 'invidiously dissimilar' treatment relative to similarly situated persons." Id.; see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 564-65 (1977). TST has alleged such facts here. Doc. 1 at ¶¶ 269; 272-280.

TST was treated differently from the Veteran's Group. Both groups are clearly similarly situated. Both organizations offered to donate private memorials to the City's veterans. Doc. 1 at ¶ 269. Both proposed monuments were viewed through a religious lens. Id. However, the clear procedural and substantive departures between the treatment of the Veteran's Group and TST compel a finding of an Equal Protection violation. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 564-65 (1977).

As alleged in the Complaint, the City granted the Veteran's Group and not TST full access to the City's policymaking personnel at all stages. Doc. 1 at ¶¶ 78-79. Prior to the Enacting Policy, the Mayor advocated on behalf of the Veterans Group by pushing for the "sticking points," i.e. including a prohibition against TST even being allowed to apply for the permit. Doc. 1 at ¶¶ 85-86.

Before even adopting the Proposal–which explicitly contemplated that a Christian monument would be going into the Park–Councilor Stier sought and received assurances that no Satanic monuments would go into the Park. Doc. 1 at ¶ 276. In contrast, the Mayor stated that the Enacting Resolution was adopted "basically, so the Cross could go back into the Park." Doc. 1 at ¶ 171.

The City decided to grant the Christian monument a permit just two days after the application. Exhibit 9. Yet TST's application took over a month to decide. Exhibit 8. The time-difference is explained because (1) Councilor Stier objected to TST's display on the mistaken impression that TST's display was categorically barred, Exhibit 10; and (2) the City subjected TST's application to greater scrutiny than the Veteran's Group's application. Doc.

1 at ¶ 107.

The City afforded Father Lynch a locally-broadcasted opportunity to lambast TST's equal participation, but never once extended an invitation to TST to locally respond. Doc. 1 at ¶¶ 167-186. Then, when it became clear that TST's Display would have to be installed, the Mayor called for an off-the-record meeting between the Council and the Veterans Group which resulted in the Rescinding Resolution. Doc. 1 at ¶¶ 191-192, 203. Shortly later, Dawn Meyer began conveying the City's plan to exclude TST's Display while the City was simultaneously leading TST on that the installation was proceeding as normal. Doc. 1 at ¶¶ 193-203.

The City falsely claims that "both permits were cancelled by operation of the Rescinding Resolution on July 17, 2017." Doc. 12 at p. 32. This ignores the record. The Christian monument was removed on July 14, three days before TST's Display was excluded. Doc. 1 at ¶¶ 200 et seq. This was no coincidence: Dawn Meyer issued notice that the Christian monument was removed just twenty minutes before notifying TST that the Recission Resolution was set to be "considered." Id. ¶¶ 200-201; see also Exhibits 23 and 24.

The City plainly afforded the Veterans Group preferential treatment over TST. Thus, the City's motion to dismiss the Federal Equal Protection claim must be denied.

### 5.2: Minnesota Equal Protection

The City also challenges TST's Minnesota equal-protection claim. As with Minnesota's Establishment Clause, the Minnesota Constitution inquires into the effects instead of the proof of motive. See State v. Russell, 477 N.W.2d 886 (Minn. 1991) (striking the crack cocaine / powder cocaine legislative distinction, as an affront to art. 1 § 2, because it disparately

impacts race).

The threshold issue in Minnesota's Equal-Protection analysis is whether the "claimant is treated differently from others to whom the claimant is similarly situated in all relevant respects." Gustafson v. Commissioner of Human Services, 884 N.W.2d 674, 682 (Minn. App. 2016). The City suggests that TST's equal protection claim fails because TST failed to allege that any similarly situated group received favorable treatment under the Enacting or Rescinding Resolution. Doc. 12 at p. 34.

As in the federal analysis, this is demonstrably false. But the only material facts are (1) the Veterans Group got to install their Christian monument for a period of 10 months; yet (2) TST did not get to install its Display for a single moment. Doc. 1 at ¶ 15; Exhibit 26. Both groups offered the City a religious monument and both groups were granted a permit. Exhibits 12-13. Yet only one group, the Christians, got to install their monument. Doc. 1 at ¶ 151. Once TST's monument was about to be installed, the City shut down the Park. Exhibit 18. TST was similarly situated, yet treated differently. Doc. 1 at ¶ 269; Exhibit 26.

The next issue is to determine whether the challenged action involves a suspect class or fundamental right. Gustafson, 884 N.W.2d, at 682. If an equal protection challenge under the Minnesota Constitution involves either a suspect classification or a fundamental right, Minnesota courts apply strict scrutiny. In re Guardianship, Conservatorship of Durand, 859 N.W.2d 780, 784 (Minn. 2015).

TST is a suspect class. As alleged in its Complaint, TST was uniquely targeted because of its religious viewpoint or because it was on the wrong end of a majoritarian political process.

Doc. 1 at ¶ 270; Plyler v. Doe, 457 U.S. 202, 218 at fn. 14, 102 S. Ct. 2382, ___ (1982).  Even if TST was not a suspect class, TST's right to present a competing religious message to the Christian monument is a "fundamental right" to which strict scrutiny also attaches.  Plyler at fn. 15 (a "fundamental right" includes those explicitly stated in the Constitution, i.e. free exercise).  Thus, the City's action is subject to strict scrutiny.

A government action only passes strict scrutiny review if it is "narrowly tailored and reasonably necessary to further a compelling governmental interest."  In re Guardianship, Conservatorship of Durand, 859 N.W.2d 780, 784 (Minn. 2015).

The City offers no explanation for why the Veterans Group got preferential access to its policymaking officials or why the City adopted the Enacting Resolution "basically, so the Cross could go back in the Park" as contrasted with seeking and receiving assurances that no Satanic monument could go into the Park.  See Doc. 12 at p. 34.  There is no justification.  This is plain viewpoint discrimination.

The City also offers no interest to justify why it passed the Recission Resolution.  See Doc. 12 at p. 34.   The Rescinding Resolution proffers some pretextual interests, though.  Supposedly, the interests were that "allowing privately-owned memorials or displays in its Park no longer meets the intent or purpose of the Park;" and "the continuation of the limited public forum may encourage vandalism in the Park, reduce the safety, serenity, and decorum of the Park, unnecessarily burden City staff and law enforcement, and negatively impact the public's health, safety and welfare."  Exhibit 25 at ¶¶ 5-6.

But the City offers no explanation for how allowing TST to place its Display would

encourage any of the issues asserted in the Rescission Resolution. The Complaint certainly alleged no increase of vandalism or riots took place when the permit was granted to TST. There were protests, sure, but protests are the price we pay for the freedoms guaranteed by the First Amendment. Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 895–96, 93 L. Ed. 1131 (1949).

And even if the pretextual interests recited in the Rescinding Resolution had any basis in fact, those interests could be served through far narrower means than arranging for the removal of the Cross so that the City could exclude TST's Display. The City could have placed appropriate security measures within the Park (e.g. security guards, security cameras, motion sensors). The City could have limited the hours that members of the public could be in the Park. The City could have prosecuted the vandals and the hooligans that were ostensibly reducing the safety, serenity, and decorum of the Park. The City could have done nothing and simply weathered the controversy. All of these were valid options.

Even if the Court finds that the rational basis test applies here, the City still cannot meet its burden. "Since the early eighties, this court has, in equal protection cases, articulated a rational basis test that differs from the federal standard." State v. Russell, 477 N.W.2d 886, 888 (Minn. 1991).

The "key distinction" between the Minnesota and Federal test is that "under the Minnesota test 'we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires.'" State v. Garcia, 683 N.W.2d 294, 299 (Minn. 2004) (quoting Russell, 477 N.W.2d at 889). Instead, Minnesota has "required a reasonable

connection between the *actual*, and not just the theoretical, effect of the challenged classification and the statutory goals." <u>Greene v. Commissioner of Minnesota Dept. of Human Services</u>, 755 N.W.2d 713, 729 (Minn. 2008) (emphasis added).

Minnesota's rational basis test involves three elements:

> (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs;

> (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and

> (3) the purpose of the statute must be one that the state can legitimately attempt to achieve

<u>Russell</u>, 477 N.W.2d, at 888.

The City has not articulated any legitimate purpose in how it applied the Enacting and Rescinding Resolutions. The actual basis for both the Resolutions was expressed by Stier in the Adopting Meeting: to allow the Cross back into the Park while simultaneously precluding other groups from the same benefit. Doc. 1 at ¶¶ 57, 61, 221, 257, 276. The City plainly adopted the drafter's "disdain" at groups like TST and perceived them as having "an aberrant view of the First Amendment." Satanic Temple I, doc. 98 (Meyer Dec.) at Exhibit 2. It is simply not a permissible purpose for the City to afford this kind of preferential treatment, as the City Attorney repeatedly tried to explain during the Adopting Meeting. Doc. at ¶ 53.

In sum, the City's actions fail muster under the strict scrutiny test and even fail muster

under the rational basis test. The Enacting and Rescinding Resolutions were plainly applied to accommodate the Cross but prevent TST's Display. Therefore, the Court should find that TST has properly stated an equal-protection claim under the Minnesota Constitution, and the City's motion should be denied.

## 6. TST's due process claim is valid because TST was deprived of its property interest and the deprivation did not meet the requirements of due process.

Finally, the City challenges TST's procedural due process claim. U.S. Const. Amend XIV ("nor shall any State deprive any person of . . . property[] without due process of law.") TST's due process claim is valid because the City deprived TST of its property interest (the permit) without meeting the requirements of due process.

To maintain a procedural due process claim, TST must show: (1) it was deprived of a property interest, and (2) the deprivation did not meet the requirements of due process." Minnetonka Moorings, Inc. v. City of Shorewood, 367 F. Supp. 2d 1251, 1257 (D. Minn. 2005).

Procedural due process "is a safeguard of the security of interests that a person has already acquired in specific benefits." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972). Procedural due process is a right conferred, "not by legislative grace, but by constitutional guarantee." Arnett v. Kennedy, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part). Thus, assuming the City could have opted not to extend the Permit, once the permit was extended it could only be taken away with due process.

## 6.1 TST had a protected property interest in the Permit when it complied with the Enacting Resolution's conditions to obtain the Permit.

The Permit is a protectible property interest which vested TST with procedural due process rights.[1] To determine whether a state right is vested with procedural due process safeguards, the Court should look to state law. See Bituminous Materials, Inc. v. Rice Cty., Minn., 126 F.3d 1068, 1070 (8th Cir. 1997). The threshold question is whether, under state law, a party has "a legitimate claim to entitlement" as opposed to a "mere subjective expectancy." Id.

The Permit is "a special use permit." See SPECIAL-USE PERMIT, Black's Law Dictionary (11th ed. 2019) (an "authorization to use property in a way that is identified as a special exception in a zoning ordinance.") In effect, the Enacting Resolution created a mechanism for a special exception to the general prohibition against affixing a religious display to the City's Park. The City granted TST such a special exception.

Minnesota has resolved that special-use permits are protected by procedural due process rights. See Barton Contracting Co., Inc. v. City of Afton, 268 N.W.2d 712, 716 (Minn. 1978). There, a city council denied an applicant a special-use permit. The Barton Court found that procedural due process rights attached to the city council proceedings because they bore

---

[1] The City points out that, technically, Reason Alliance applied for the permit instead of TST. Doc. 12 at 35. Yet, as the City points out in its motion for summary judgment, Reason Alliance and TST are headed by the same directors. TST I at Doc. 83. Additionally, TST's response provided the testimony that Reason Alliance's organizational purposes are to support the mission of TST. Id. at doc 94. Regardless, the application and permit both make reference to TST. Exhibits 8 and 12. If the Court finds that Reason Alliance is either a necessary party or is the real party in interest in this litigation, the Court should grant leave for TST to amend the complaint to add or substitute Reason Alliance. FRCP 15, 17(a), 19(a).

"directly on the particular interests of the applicant." Id. at 715-16.

The permit conferred a upon TST a specific benefit, that TST could install its Display in the Park for a period of "one year from the date of this letter [i.e. until March 29, 2018];" upon which time TST would have to remove the display and could reapply to place another display. Exhibit 12.

The City points out that the Enacting Resolution provided TST with notice that the contemplated permit could be revoked at-will. Doc. 12 at p. 35. This is a strawman argument. The Permit is the property right under review, not the Enacting Resolution. The Permit provided TST with a right to emplace the Display until March 29, 2018, not "March 29, 2018 except if the City feels like revoking this right earlier." Cf. Exhibit 12. Thus, the text of the Enacting Resolution is irrelevant. Under Barton, the Permit vested TST with a protectible property interest in emplacing its Display in the Park until March 29, 2018 which could not be taken away without procedural due process.

### 6.2 The City's Rescinding Resolution violated TST's procedural due process rights because it never gave TST an opportunity to be heard.

Whether a government's safeguards are sufficient to satisfy procedural due process requirements considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976); cf. Anderson v. Douglas Cty., 4 F.3d 574,

578 (8th Cir. 1993) ("assuming a landowner has a protectible property interest, procedural due process is afforded when the landowner has notice of the proposed government action and an opportunity to be heard.")

The "private interest" that will be affected by the official action is the Permit. Exhibit 12. The Permit is TST's entitlement to participate in the City's plan to open the Park to private religious displays that honor Belle Plaine Veterans. Id. This issue arises under the First Amendment, which are "of the highest order under the Constitution." Federal Election Com'n v. Massachusetts Citizens for Life, Inc., 107 S.Ct. 616, 630, 479 U.S. 238, 263 (U.S. 1986); see also Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255 (2002). The Court should hold that TST's Free Speech interest, which was implicated by the Permit, demands the highest safeguards to comply with procedural due process.

Minimally, TST should have been afforded a reasonable notice and a right to be heard. Anderson, above. TST did not receive a reasonable notice. Instead, the City's administrator sent an email to TST on Friday, July 14, 2017 at 10:06 am stating that "[a]s a courtesy," the City was letting TST know that the Recission Resolution would be considered by the City Council. Exhibit 24. The email also indicated that the City's administrator's "schedule is booked the rest of the day." Exhibit 24. Importantly, the email did not specify that the City Council would be "considering" the Recission Resolution the next business day. Id.

This is not a reasonable notice. The City knew that TST's directors–if they were going to be heard–would have to engage in cross-country travel on one business day of notice. Cf. Exhibit 12 (addressing the Permit to Salem, MA). The City should have at least given TST

notice when the meeting would be, if TST was to engage with the people who would be resolving whether to exclude TST's display from the Park. Even then, the Recission Resolution was a pretext. The real determination to exclude TST was made at the secret Workshop meeting between the Council and the Veterans Group. Doc. 1 at ¶¶ 191.

Moreover, TST was withheld *any* right to be heard, much less a reasonable one. The City had already resolved it was going to exclude TST from the Park before notifying TST that it would be "considering" the Recission Resolution. Exhibit 24.

At no stage was TST offered a right to be heard. The City never gave TST any notice of the secret meetings with the Veterans Group; never gave TST any notice of the Objection Meeting; and even had TST's directors vacated their schedules to attend the Recission Meeting, the Recission Meeting excluded an opportunity for public discussion on whether the City would revoke TST's permit. Doc. 1 at ¶ 209.

This fails to meet <u>Barton</u>, 268 N.W.2d at 715, which held that a public meeting with the involved parties and City decision makers was sufficient to provide safeguards. Such a forum would have allowed TST to actually contest the City's action, with the City's decision makers, and would have provided TST with procedural due process for the private interests implicated by the Permit. Absent a right to be heard, the risk of TST being erroneously deprived of its private interest in the Permit was more of a guarantee.

Finally, the government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail is de minimis. "Financial cost alone is not a controlling weight in determining whether due

process requires a particular procedural safeguard prior to some administrative decision." Mathews, 424 U.S., at 348. And, here, the City would not need to put on a trial, and expend enormous financial resources, before making its decision to revoke a permit. A single hearing with the City's decision makers and the parties that were granted a permit, where each side would have an opportunity to present their views would suffice. Such hearings were held regularly in the course of the City's business and specifically as it related to the limited public forum in question here. Exhibit 28 (all meetings other than the Recission Meeting). Therefore, the Court should hold that the government's interest in quickly revoking TST's permit without providing a single forum for TST to be heard is de minimis compared with the rights implicated by the Permit.

In sum, TST's due process claim is valid because TST was deprived of its property interest and the deprivation did not meet the requirements of due process, as no notice and hearing were ever provided before the revocation. Accordingly, the City's motion must be denied.

**WHEREFORE** TST prays this Court enter an order denying the City's motion in full.

Respectfully submitted on March 22, 2021,
on behalf of The Satanic Temple
By: /s/ Matthew A. Kezhaya
Matthew A. Kezhaya, MN # 0402193
**KEZHAYA LAW PLC**
100 S. Fifth Street, 19th Floor
Minneapolis, MN 55402
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

**ROBERT R. HOPPER AND ASSOCIATES, LLC**

*/s/Jason S. Juran*
Jason S. Juran, Esq. (MN # 397935)
Robert R. Hopper, Esq. (MN # 208760)
333 S. Seventh Street, Suite 2450
Minneapolis, MN 55402
P: (612) 455-2199
F: (612) 455-1689
E: jasonjuran@robertrhopper.com
E: robert.hopper@robertrhopper.com

## CERTIFICATE AND NOTICE OF SERVICE

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on March 22, 2021 which sends service to registered users, including all other counsel of record in this cause. /s/ Matthew A. Kezhaya